UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

YOLANDA MARIE HERBERT, Personal
Representative of the Estate of MARIE
HERMINIE BARRON, Deceased,

                Plaintiff,                  No. 09-CV-12314

vs.                                    Hon. Gerald E. Rosen

DANNIE RAY BAKER, CITY OF
INKSTER, LT. THOMAS DIAZ and
OFFICER JOHN HANKINS,

                Defendants.

_____/

OPINION AND ORDER REGARDING THE CITY
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on _____February 25, 2011_____

PRESENT:   Honorable Gerald E. Rosen
                   United States District Chief Judge

## I.  INTRODUCTION

This Section 1983 case is presently before the Court on the Motion for Summary

Judgment filed by Defendants Thomas Diaz, John Hankins and the City of Inkster (the

"City Defendants").  Plaintiff has responded to Defendants' Motion and Defendants have

replied.  Having reviewed and considered the parties' briefs, supporting evidence, and the

entire record of this matter, the Court finds that the pertinent facts and legal contentions

1

are sufficiently presented in these materials, and that oral argument would not assist in the

resolution of this matter.  Accordingly, pursuant to Eastern District of Michigan Local

Rule 7.1(f)(2), the Court will decide Defendants' motion "on the briefs." This Opinion

and Order sets forth the Court's ruling.

## II.  <u>PERTINENT FACTS</u>

On November 9, 2007, Defendant Dannie Ray Baker appeared at the Inkster,

Michigan Police Department to serve a voluntary weekend incarceration pursuant to a

Judgment of Sentence imposed upon him in state court for driving with a forged drivers'

license.  The voluntary weekender program is for misdeamnants who agree to voluntarily

report to jail on scheduled weekends.  Baker was sentenced to serve 30 weekends.  On the

date in question, Baker was scheduled to serve the 28th of these weekends.

Baker appeared at the Inkster Police Department at approximately 5:50 p.m. on

November 9th.  However, immediately upon his appearance, the intake officers detected

alcohol on Baker's breath.  According to the undisputed testimony of Officer Douglas

Parsons and Lieutenant Diaz, other than the odor of intoxicants, Baker had no outward

signs of intoxication.  He was able to walk, his speech was not slurred, and he was able to

carry on conversations. A breathalyzer test was subsequently administered which

indicated that Baker's blood alcohol content was .09.[1]  Both before and after the

breathalyzer test, Baker lied to the officers about drinking.  Though he told the officers at

---

[1]  In Michigan, a person is legally intoxicated if his blood-alcohol content is .08.
*See* M.C.L. § 257.625.

2

the time that he had not been drinking, in his deposition, Baker testified that before

reporting to the Inkster Police Station, he stopped at Leon's Liquor Store, which is near

the Police Station, purchased a pint of vodka, parked in the skating rink parking lot which

is on property adjacent to the police station, took some sleeping pills and drank the pint of

vodka.  [*See* Baker 11/19/2008 Deposition, Plaintiff's Ex. H, pp. 19-22.]

The Inkster Police Department has a policy of not admitting intoxicated

weekenders.   Because Baker was intoxicated, he was not accepted for his voluntary

incarceration.   Lieutenant Diaz asked Baker how he had gotten to the police station and

Baker told him he had been dropped off.  [*See* Deposition of Thomas Diaz, Plaintiff's Ex.

K, pp. 61-62.]  Diaz testified that he directed Officer Hankins to escort Baker to the lobby

so that he could use the pay phone and make arrangements for a ride home.  *Id.* at 62.

Officer Hankins walked Baker down the hallway to the lobby and pointed out the pay

phone.  [Deposition of John Hankins, Plaintiff's Ex. D, p. 15-16.]  Officer Hankins did

not wait to see whether Baker made the phone call.  He testified that when they got to the

lobby, Baker went to sit down in one of waiting area chairs.  Hankins testified that he

assumed Baker went to use the pay phone shortly thereafter because when he turned to

walk back into the hallway, out of his peripheral vision, through the lobby window he

saw Baker stand up and appeared to be headed toward the phone.  *Id.*

Baker, however, did not call for a ride.  Contrary to what Baker had told the

officers, Baker had driven himself to the police station and had parked his SUV in the

parking lot of the skating rink which was on property adjacent to the police department's

3

property.  Baker simply walked out of the lobby and down the sidewalk to the skating

rink, and left in his own vehicle.  No officer knew Baker had driven or saw Baker driving

a vehicle either arriving or departing from the police station.

A short while later, Inkster Police officers were dispatched to Michigan Avenue

and Henry Ruff Roads on a report of a car accident.  When the officers arrived, it was

discovered that Baker was the driver of the SUV which struck Marie Barron's vehicle

causing her death.  An empty vodka bottle was found in the car.

Baker was thereafter taken to Annapolis Hospital where his blood-alcohol level

was tested again and this time it measured .17.  [*See* Deposition of Inkster Police Chief

Gregory Gaskin, Plaintiff's Ex. E, p. 48.]

Baker was subsequently tried and convicted by a jury on charges operating vehicle

on a suspended license, causing death; operating a vehicle while intoxicated causing

death; and manslaughter due to operation of a motor vehicle.  On August 12, 2008, he

was sentenced to 15 years' imprisonment.

On April 18, 2008, Plaintiff instituted this civil action.  In her First Amended

Complaint, Plaintiff alleged Section 1983 claims against Defendants Diaz, Hankins and

the City of Inkster.  She also alleged state law common law wrongful

death/negligence/gross negligence claims against Defendants Baker, Diaz and Hankins.

Discovery has closed in this matter and Defendants Diaz, Hankins and the City of

Inkster now move for summary judgment.

### III.  <u>DISCUSSION</u>

4

A.   <u>STANDARDS APPLICABLE TO MOTIONS FOR SUMMARY JUDGMENT</u>

Summary judgment is proper if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  As the Supreme Court has explained, "the plain language of Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).  In deciding a motion brought under Rule 56, the Court must view the evidence in a light most favorable to the nonmoving party.  *Pack v. Damon Corp.,* 434 F.3d 810, 813 (6th Cir. 2006).  Yet, the nonmoving party may not rely on mere allegations or denials, but must "cit[e] to particular parts of materials in the record" as establishing that one or more material facts are "genuinely disputed."  Fed. R. Civ. P. 56(c)(1).  Moreover, any supporting or opposing affidavits or declarations "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).  Finally, "the mere existence of a scintilla of evidence that supports the nonmoving party's claims is insufficient to defeat summary judgment."  *Pack,* 434 F.3d at 814 (alteration, internal quotation marks, and citation omitted).

B.   PLAINTIFF HAS FAILED TO MAKE OUT A LEGALLY COGNIZABLE
     SECTION 1983 CLAIM

Section 1983 provides a federal cause of action for civil damages against an individual acting under color of state law who deprives another of "rights, privileges or immunities secured by the Constitution of and laws."  42 U.S.C. § 1983.  In this case, Plaintiff argues that Lieutenant Diaz and Officer Hankins violated the late Marie Barron's substantive due process rights under Fourteenth Amendment when they failed to protect her from the drunk driver who caused her death by failing to insure that the Defendant Dannie Ray Baker called someone else to drive him home from the Inkster Police Station on November 9, 2007.  Lieutenant Diaz and Hankins counter that no constitutional violation occurred and that even if it had, they are protected by qualified immunity.

The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const., amend. XIV, § 1.  However, "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors," and the Supreme Court has refused to read into the constitutional provision any such duty.  *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 195,109 S.Ct. 998, 1003(1989).  While "a State may through its courts and legislatures, impose such affirmative duties of care and protection upon its agents if it wishes," such duties will not be "thrust upon them by this Court's expansion of the Due Process Clause of the Fourteenth Amendment."  *Id.* at 202-03, 109 S.Ct. at 1007.

In *DeShaney* the Court addressed a claim brought by a mother and her child under

6

42 U.S.C. § 1983 against the county department of social services, alleging that the child had been denied due process of law when the department failed remove the child from his abusive father's home.  The state had taken temporary custody of the child, based on suspicions of abusive circumstances; however, the state did not maintain custody of the child and returned him back to his father's home.  The father thereafter beat the child so severely that he suffered permanent brain damage and was rendered profoundly retarded. The defendants were granted summary judgment by the district court, and both the Seventh Circuit and the Supreme Court affirmed.  In so doing, the Supreme Court reaffirmed that state officials are not liable for injuries resulting from violent acts by third parties, explaining "our cases have recognized that Due Process Clauses generally confer no affirmative right to government aid, even where such aid may be necessary to secure life, liberty or property interests of which the government itself may not deprive the individual."  *Id.* at 196, 109 S.Ct. at 1003.

The *DeShaney* Court, however, recognized one exception to this rule:  "When the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being."  *Id.* at 199- 200, 109 S.Ct, at 1005-06.  The Court explained that this "affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf."  *Id.*  Accordingly, "it is the State's affirmative act of restraining the individual's freedom to act on his own behalf -- through

7

incarceration, institutionalization, or other similar restraint of personal liberty -- which is

the deprivation of liberty triggering the protections of the Due Process Clause, not its

failure to act to protect his liberty interests against harms inflicted by other means."  *Id.*

(internal punctuation omitted).

Since *DeShaney*, the Sixth Circuit has recognized a second exception to the

prohibition against holding public officials constitutionally responsible for private acts of

violence:

> Relying on the following language from *DeShaney* -- "[w]hile the State may
> have been aware of the dangers that Joshua faced in the free world, it
> played no part in their creation, nor did it do anything to render him any
> more vulnerable to them," [489 U.S.] at 201, 109 S.Ct. 998 -- we have held
> that when the State "cause[s] or greatly increase[s] the risk of harm to its
> citizens . . . through its own affirmative acts," it has established a "special
> danger" and a duty to protect its citizens from that risk.

*Jones v. Reynolds*, 438 F.3d 685, 690 (6th Cir. 2006), *cert. denied*, 546 U.S. 1166 (2007)

(quoting *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066 (6th Cir. 1998)).  Under

this "state-created danger" exception, a state may be liable in non-custodial settings for

"affirmative acts. . . which either create or increase the risk that an individual will be

exposed to private acts of violence."  *Kallstrom, supra*, 136 F.3d at 1066.

To establish a "state created danger" claim, a plaintiff must show:

> "(1) an affirmative act by the state which either created or increased the risk
> that the plaintiff would be exposed to an act of violence by a third party: (2)
> a special danger to the plaintiff wherein the state's actions placed the
> plaintiff specifically at risk, as distinguished from a risk that affects the
> public at large; and (3) the state knew or should have known that its actions
> specifically endangered the plaintiff."

*Jones v. Reynolds, supra*, 438 F.3d at 690 (quoting *Cartwright v. City of Marine City*, 336 F.3d 487, 493 (6th Cir. 2003)).

In this case, Plaintiff attempts to bring her claim under both *DeShaney*'s "custodial relationship" theory and the Sixth Circuit's "state created danger" exception.

1.    THE *DESHANEY* CUSTODIAL OR "SPECIAL RELATIONSHIP" EXCEPTION IS INAPPLICABLE HERE

*DeShaney*'s custodial exception does not apply in this case because the decedent was never in custody. The custodial exception triggers a constitutional duty to provide adequate medical care to incarcerated prisoners, those involuntarily committed to mental institutions, foster children, pre-trial detainees, and those under "other similar restraint of personal liberty." *Jackson v. Schultz*, 429 F.3d 586, 590 (6th Cir. 2005) (quoting *DeShaney*, 489 U.S. at 200). *See also, Stemler v. City of Florence*, 126 F.3d 856, 867-68 (6th Cir. 1997), *cert. denied*, 523 U.S. 1118 (1998). In *Stemler*, the court determined that police officers violated the plaintiff's decedent's substantive due process rights when, during the course of a traffic stop, they physically lifted her from a car in which she had been riding against her will, and placed her in a truck driven by her abusive, intoxicated boyfriend, who had a fatal accident shortly thereafter. The court found that the woman was deprived of her liberty (and ultimately her life) without due process when the police threatened to arrest her if she did not leave with her boyfriend and, subsequently, physically placed her in his truck. The court determined that under these circumstances, "the officers took the 'affirmative act of restraining [the decedent's] freedom to act on her

9

[own] behalf,' and consequently imposed upon themselves a duty to ensure that they were not placing her in danger."   *Id.*

Plaintiff here conflates the issue of who it is that must be "in custody" so as to create a custodial special relationship triggering the protections of the Due Process Clause.  As *DeShaney* and its progeny make clear, it is only when the *plaintiff's* (or the plaintiff-decedent's) personal freedom to act on her own behalf that a duty to insure that she is not placed in danger may be triggered.  That Dannie Ray Baker -- a *defendant* -- may have been in the custody of the Inkster Police just prior to the fatal accident did not create a "special relationship" with Plaintiff's decedent so as to give rise to a duty to insure her safety.

Plaintiff's reliance on *Davis v. Brady*, 143 F.3d 1021 (6th Cir. 1998), *cert. denied*, 525 U.S. 1093 (1999), is misplaced.  In that case, the plaintiff, Steverson Davis, after having consumed a substantial amount of alcohol, attempted to enter the Carriage Town Mission in Flint, where he had been living. The mission staff refused him entry due to his inebriated condition.  Davis became violent and broke some of the mission's windows. The mission staff called the police.  Police officers responded to the call and arrested Davis for intoxication and disorderly conduct and brought him to the Flint police station. Davis was subsequently transferred to the county jail, but that facility was full. The desk sergeant therefore instructed the officers to release Davis at the county jail if he was not so drunk that he would be a hazard to himself.  Disregarding these instructions, the officers handcuffed Davis and placed him back in the squad car.  The officers then drove

10

Davis to an isolated 55-mile-per-hour speed limit area outside the city limits of Flint, where there were few street lights and no sidewalk, and told Davis to find his own way back into the city.  A short while later, Davis was hit by a car, sustaining serious permanent injuries. One of his legs was amputated, and he became a semi-quadriplegic.

Davis thereafter sued the Flint police officers under Section 1983 for violation of his due process rights.  The defendant officers argued that the *DeShaney* exception did not apply; that they owed no duty of care to Davis because his injuries occurred after they released him from custody and they did nothing to prevent Davis from caring for himself. The Sixth Circuit found no merit in the officers' argument, but not because of the "just released from custody" argument Plaintiff here proffers.  Rather, the court held:

> Language in [*DeShaney*] suggests that the state may owe a duty to individuals in certain non-custodial settings:
>
>> While the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them. That the State once took temporary custody of Joshua does not alter the analysis, for when it returned him to his father's custody, it placed him in no worse position than that in which he would have been had it not acted at all; the State does not become the permanent guarantor of an individual's safety by having once offered him shelter.
>
> 489 U.S. at 201, 109 S.Ct. at 1006. Significantly, we have previously suggested that this language in *DeShaney* stands for the proposition that "a duty to protect can arise in a noncustodial setting if the state does anything to render an individual more vulnerable to danger." *Gazette v. City of Pontiac*, 41 F.3d 1061, 1065 (6th Cir.1994). Unlike the situation in *DeShaney*, moreover, the defendant officers in this case placed Davis in a more dangerous situation than he was prior to their interference, when they drove him outside the Flint city limits and abandoned him on a dark and dangerous highway in an unfamiliar area.

Likewise, the defendant officers' contention that the release of Davis from their custody terminated their duty is unavailing. The holding in *Stemler*, 126 F.3d at 867-868, established that an officer's duty exists even after the custodial relationship has ended. In *Stemler*, this court determined that police officers violated a woman's substantive due process rights when they took her from a car in which she had been riding and placed her in a truck driven by her abusive, intoxicated boyfriend, who wrecked shortly thereafter. The court found that the woman was deprived of her liberty (and ultimately her life) without due process when the police threatened to arrest her if she did not leave with her boyfriend and, subsequently, physically placed her in his truck. Even though the woman was out of police custody when she was killed, we held that the police had a duty to protect her by focusing on the fact that she was in the officers' custody at the time she was forced into the truck. *Id*. at 869.

Just as the police in *Stemler* had a duty to the plaintiff because they put her in harm's way, the defendant officers here owed Davis a duty. Based on *Stemler*, the fact that Davis's injuries resulted after the defendant officers released him from custody is not controlling. What is key is that the defendant officers put Davis [i.e., *the plaintiff*] in a situation, while in custody, and allegedly against his will, that caused his injuries.

143 F.3d 1025-26.

The foregoing makes clear that the *DeShaney* "custodial" or "special relationship" theory of liability does not apply in this case. This leaves only the "state created danger" as the only possible means for Plaintiff to establish her Section 1983 claim. As the Sixth Circuit has noted, the state-created danger theory presents a very "demanding standard for constitutional liability." *Sargi v. Kent City Bd. of Educ.*, 70 F.3d 907, 913 (6th Cir. 1995).

2.   PLAINTIFF HAS FAILED TO MAKE OUT A "STATE-CREATED DANGER" CLAIM

As indicated above, to establish a "state created danger" claim, a plaintiff must

show:

> "(1) an affirmative act by the state which either created or increased the risk that the plaintiff would be exposed to an act of violence by a third party; (2) a special danger to the plaintiff wherein the state's actions placed the plaintiff specifically at risk, as distinguished from a risk that affects the public at large; and (3) the state knew or should have known that its actions specifically endangered the plaintiff."

*Jones v. Reynolds, supra*, 438 F.3d at 690.

(a)     Plaintiff Has Failed to Show that the Defendant Officers Engaged in a Cognizable "Affirmative Act"

Plaintiff argues that the Defendants' failure to insure that Baker was not driving the evening of November 9, 2007 created a danger to the Plaintiff's decedent.  While it is true that "a duty to protect can arise in a non-custodial setting if the state does anything to render an individual more vulnerable to danger," *Gazette v. City of Pontiac*, 41 F.3d 1061, 1065 (6th Cir. 1994), the Sixth Circuit has made clear that a "failure to act is not an affirmative act under the state created danger theory."  *Jones v. Reynolds, supra*, 438 F.3d at 691 (police officers who arrived at the scene of a drag race before the race and had the opportunity to prevent it from the beginning but failed to do so held not to have committed an affirmative act subjecting them to liability under the state created danger theory); *see also Cartwright v. City of Marine City*, 336 F.3d 487, 493 (6th Cir. 2003) (leaving an intoxicated man in the parking lot of a convenience store near a busy highway was not an affirmative act giving rise to a duty to protect the man from the danger of being hit by a truck) *Schroder v. City of Fort Thomas*, 412 F.3d 724, 728-29 (6th Cir. 2005) (failing to respond to parental complaints about speeding drivers in a specific

13

residential neighborhood was not an affirmative act); *Jones v. Union County*, 296 F.3d 417, 431 (6th Cir. 2002) (failing to serve an ex parte protection order on an abusive spouse was not an affirmative act); *Sheets v. Mullins*, 287 F.3d 581, 588-89 (6th Cir. 2002) (failing to pursue and investigate a domestic-disturbance call held not to be an affirmative act); *Weeks v. Portage County Executive Offices*, 235 F.3d 275, 279 (6th Cir. 2000) (failing to call an ambulance for an obviously injured citizen was not an affirmative act); *Robinson v. Twp. of Redford*, No.04-1117, 2005 U.S.App. LEXIS 15003 (6th Cir., July 20, 2005) (failure of police to insure that intruder had left the premises after the report of a break-in held not to be an affirmative act).

As noted in *Jones v. Reynolds,* "[w]hether the conduct of government officials in some cases should be treated as a failure to act or as action 'may be a difficult question in the abstract.'" 438 F.3d at 692 (quoting *Bukowski v. City of Akron*, 326 F.3d 702, 709 (6th Cir. 2003). Nevertheless, the Sixth Circuit "ha[s] always treated governmental conduct as falling on the inaction side of the line when it does not create or increase the risk of peril posed by the private actor." *Id.* (citations and internal punctuation omitted.) In this regard, in determining whether a police officer's conduct increased the risk of peril, "the question is not whether the victim was safer *during* the state action, but whether she was safer *before* the state action than she was *after* it." *Jones v. Reynolds, supra* (quoting *Cartwright*, 336 F.3d at 493). The issue thus framed is entirely consistent with *DeShaney*. As explained by the Sixth Circuit:

Although in *DeShaney* the state returned Joshua to the ultimate aggressor,

14

the *DeShaney* Court explicitly rejected the idea that such acts met the state action requirement.  The court in *DeShaney* was not merely assuming that state actors did not contribute to the hazards faced by Joshua, but it was also holding that the act of returning someone to the same dangers that existed status quo ante does not satisfy the state-action requirement.

*Bukowski v. City of Akron,* 326 F.3d at 709.

In *Koulta v. Merciez*, 477 F.3d 442 (6th Cir. 2007), the estate of a motorist who was killed in a collision with a drunk driver sued the City of Centerline and three individual Centerline police officers under Section 1983 for violation of the decedent's due process rights.  In that case, Chrissy Lucero went to the house of her ex-boyfriend, Frank Offrink, hoping to reconcile with him.  Offrink was not there and after waiting a short while in her car in Offrink's driveway, she left the house to purchase some liquor, then returned and started drinking.  After feeling a little buzzed, Lucero left again and went to another convenience store and purchased a 40-ounce bottle of Colt 45 Malt Liquor.  She again returned to Offrink's house and tried to reach him on his cell phone to no avail.  She then took a Paxil (anti-depressant) and drank the rest of the second bottle of liquor.  After attempting to find Offrink at other locations, Lucero returned to Offrink's house, pounded on the door and tried to climb up the trellis.  Offrink's mother, who resided with her son, called the Centerline Police Department and three officers responded to the call.

After checking the license plate on Lucero's car, the officers learned that it was expired.  They questioned Lucero and Offrink's mother who told the officers that she wanted Lucero removed from her property.  The officers ordered Lucero to leave.  They

15

did not, however, cite her for having expired license plates, did not conduct any investigation into her driving record, and did not administer a sobriety test.  They simply told Lucero that she needed to just "get over it," accept that Offrink was "with someone else," and "go home" and gave her "10 seconds to get out of [t]here."  477 F.3d at 444.

Lucero drove from Offrink's house and "a dozen minutes or so" after speaking for the last time with the police, she crashed into Sami Koulta's vehicle, killing him instantly. *Id.*

Koulta's estate filed suit.  The district court denied the defendants' motion for summary judgment.  Finding that the plaintiff failed to establish that the officers "created or increased" the risk of harm to the plaintiff's decedent, the Sixth Circuit reversed:

> The risk of harm in this case was that Lucero's drinking and driving would injure someone.  As a matter of law, Koulta's estate has failed to show that the officers "created" or "increased" that risk.  Before they arrived on the scene, Lucero (by her own admission) already had gotten in her car four times four times to drive after she got a "little buzzed" from the first 40-ounce beer she consumed:  once to drive to the store to get the second 40-ounce beer; once to drive back to the Offrink's house after buying the beer; once to drive to the house of a friend of Frank Offrink's, all while finishing the second 40-ounce beer, throwing the empty bottle out of the window and taking a Paxil; and once more to return to the Offrink's house.  On this record, the officers did not "create" or "increase" the risk that Lucero would drink and drive.  Lucero's proclivity to engage in risky, and illegal, behavior had blossomed long before the officers arrived on the scene.
> The officers' failure to administer a breathalyzer test or otherwise to determine the extent of Lucero's drinking. . . did not "create" or "increase" the danger of Lucero drinking and driving -- that predated their arrival on the scene. . . .  The claimant cannot maintain that Lucero never would have been drinking and driving that night but for the officers' conduct -- given her acknowledged behavior before they arrived.  And the claimant cannot maintain that Lucero would not have driven to the scene of the accident but

16

> for the officers' conduct. . . .  Nothing prevented [Lucero] either (1) from driving down the block, then calling a cab or waiting to drive the rest of the way home after becoming sober or (2) from asking the officers for assistance in getting home.
>
> In the final analysis, Lucero's admitted proclivity to drink and drive that evening placed Koulta (and other people using the roadways) in as much danger before the officers arrived as after.

477 F.3d at 446 (internal citations to the record omitted).

As in *Koulta*, here, the admitted testimony of Defendant Baker was that he drank a pint of vodka *before* going into the police station.  Therefore, even construing the Defendant officers' conduct in failing to insure that Baker used the pay phone in the lobby to call for a ride as an "affirmative act," because Baker would have posed the same risk to Plaintiff's decedent before having any contact with the Defendant officers in the police station as he did after he left, Plaintiff cannot establish that such an affirmative act either created or increased the risk to which the plaintiff's decedent would be exposed.

(b)    Plaintiff Has Failed to Satisfy the "Special Danger" Requirement

Plaintiff also has failed to establish a "special danger."  A special danger exists "where the state's actions place the victim specifically at risk, as distinguished from a risk that affects the public at large."  *Jones v. Reynolds,* 438 F.3d at 696 (quoting *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066 (6th Cir. 1998)).  As the *Jones* court observed:

> In the only cases where we have recognized a "state created danger," the government could have specified whom it was putting at risk, nearly to the point of naming the possible victim or victims.  *See Caldwell v. City of Louisville*, 120 Fed. Appx. 566, 573 (6th Cir. 2004) (concluding that where the threat posed by an abusive husband was only to his wife, the state action "placed the victim specifically at risk"); *Waller v. Trippett*, 49 Fed. Appx.

17

45, 50 (6th Cir. 2002) (concluding that public employees working in a prison kitchen were a "limited and specifically definable group," satisfying the special-danger requirement); *Duvall v. Ford*, 187 F.3d 635 (6th Cir. 1999) (dismissing on grounds of no affirmative act but acknowledging specific endangerment where a prisoner incarcerated for abusing his wife escaped and fired shots into the trailer where she was living, injuring a family member); *Kallstrom* [*v. City of Columbus*], 136 F.3d [1066,] 1067 [(6th Cir. 1998)] (releasing the personnel files of undercover officers, including information about their families and homes, to defense attorneys specifically endangered the officers and their families).

       Where by comparison the victim was not identifiable at the time of the alleged state action/inaction, we have held that a § 1983 suit may not be brought under the "state created danger" theory. *See Schroder v. City of Fort Thomas*, 412 F.3d 724, 729 (6th Cir. 2005) (failing to enforce or lower the speed limit on a residential street "did not create a 'special danger' to a discrete class of individuals (of which the Schroders' son was a member), as opposed to a general traffic risk to pedestrians and other automobiles"); *Jones v. City of Carlisle*, 3 F.3d 945, 949-50 (6th Cir. 1993) (holding that an epileptic driver was "no more a danger to [the plaintiff] than to any other citizen on the City streets"); *Janan v. Trammell*, 785 F.2d 557, 560 (6th Cir. 1986) (holding that the release of an inmate on parole, who eventually murdered a citizen, did not violate the Due Process Clause because "there is [no] showing that the victim, as distinguished from the public at large faced a special danger"). . . .

438 F.3d at 696-97.

It is clear from the foregoing that Plaintiff cannot establish the requisite "special

danger" to Decedent Marie Barron to satisfy the second element of a state created danger

claim.[2]  Therefore, Plaintiff cannot establish that the Defendant officers violated the late

---

      [2]  To the extent that Plaintiff here argues that the Court should find a "special danger" because the decedent was in a small defined group of potential victims, i.e., only those motorists on the same street as Baker, "a plaintiff cannot merely. . . name a more particular subclass of the public as the group to which the government owed a duty," such as similarly-situated motorists. "[Motorists] are still the public."  *Kennerly v. Montgomery County Bd. of Comm'rs*, 257 F. Supp. 2d 1037, 1044 (S.D. Ohio 2003).  In

Marie Barron's substantive due process rights under Fourteenth Amendment.

C.   PLAINTIFF HAS NOT SHOWN A VIOLATION OF A CONSTITUTIONAL
      RIGHT THAT WAS "CLEARLY ESTABLISHED" AT THE TIME OF THE
      OFFICERS' ACTION/INACTION

      Defendants Diaz and Hankins raised the defense of qualified immunity in their

affirmative defenses and now argue it in seeking entry of summary judgment in their

favor.

      Qualified immunity shields public officials who perform discretionary functions

from the necessity of defending against tort liability so long as their conduct does not

violate clearly established rights of which a reasonable official would have known.  *See*

*Fisher v. Harden*, 398 F.3d 837, 842 (6th Cir.), *cert. denied*, 546 U.S. 1075 (2005).  The

doctrine is designed to "avoid excessive disruption of government and permit the

resolution of many insubstantial claims on summary judgment."  *Harlow v. Fitzgerald*,

452 U.S. 800, 818 (1982).  It protects "all but the plainly incompetent or those who

knowingly violate the law."  *Malley v. Briggs*, 475 U.S. 353, 341 (1986).  Qualified

immunity is an affirmative defense; once asserted, the "burden of proof is on the plaintiff

to show that the defendant[s] [are] not entitled to qualified immunity."  *Armstrong v. City*

*of Melvindale*, 432 F.3d 695, 699 (6th Cir. 2006) (citing *Sheets v. Mullins*, 287 F.3d 581,

_____

*Schroder, supra*, the court found no special danger despite the fact that Mrs. Schroder
had been campaigning for a reduced speed limit or better enforcement of the current
speed limit on a particular stretch of a residential street on which her family lived and
despite the fact that the boy killed by the speeding motorist was Schroder's son because
the threatened group -- people who lived on the street -- was not sufficiently "discrete."
412 F.3d at 729.

19

586 (6th cir. 2002)).

Whether qualified immunity applies turns on the "objective legal reasonableness" of the official's action, viewed on a fact-specific, case-by-case basis. *Id.* (citing *O'Brien v. City of Grand Rapids*, 23 F.3d 990, 999 (6th Cir. 1994)).  To analyze claims of qualified immunity, the court uses a two-part test "(1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated, and (2) whether that right was clearly established."  *Estate of Carter v. City of Detroit*, 408 F.3d 305, 310-11 (6th Cir. 2005) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).[3]  "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034 (1987).  In order for the law to be "clearly established," the law must "truly compel (not just suggest or allow or raise a question about), the conclusion. . . that what the defendant is doing violates federal law in the circumstances."  *Beard v. Whitmore Lake School Dist., supra*, 402 F.3d at 607 (quoting *Saylor v. Bd. of*

---

[3]  In some Sixth Circuit cases, the Court of Appeals occasionally has employed a three-step qualified immunity analysis, adding a third step to the inquiry "whether the plaintiff has offered sufficient evidence 'to indicate what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights.'" *See e.g., Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 901 (6th Cir. 2004), *cert. denied*, 544 U.S. 975 (2005); *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003). However, in cases subsequent to *Saucier*, the Supreme Court has not formally broken up the two steps prescribed by *Saucier* into three steps, *see e.g., Brosseau v. Haugen*, 543 U.S. 194, 125 S.Ct. 596 (2004); *Groh v. Ramirez*, 540 U.S. 551, 563, 124 S.Ct. 1284 (2004), and since the two-step approach comports with the Supreme Court's most recent qualified immunity cases, it is this approach that the Court will apply here.

20

*Educ.*, 118 F.3d 507, 515-16 (6th Cir. 1997) and *Lassiter v. Ala. A & M Univ. Bd. of Trustees*, 28 F.3d 1146, 1150 (11th Cir. 1994)).  If the controlling law is not clearly established, an official cannot be liable, because "a reasonable person would not be expected to know how to structure his conduct to avoid liability."  *Mendoza v. Block*, 27 F.3d 1357, 1361 (9th Cir. 1994).  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful **in the situation he confronted**."  *Saucier, supra*, 533 U.S. at 202 (emphasis added).  *See also, Armstrong v. City of Melvindale, supra*, ("In undertaking this inquiry, we do not assess the right violated at a high level of generality, but instead, we must determine whether the right [is] 'clearly established' in a more particularized sense. . . .")

Applying these standards here, as set forth above, Plaintiff has not established a violation of a constitutional right.  But even assuming *arguendo* that she has, Plaintiff has not shown that this right was "clearly established."  No authority from the Supreme Court or the Sixth Circuit that existed at the time of the incident complained of compels the conclusion that, by failing to insure that Defendant Dannie Ray Baker called someone else to drive him home from the Inkster Police Station on November 9, 2007, the officers committed a legally cognizable affirmative act when they did not create or increase the danger to Marie Barron specifically.  Qualified immunity, therefore, protects Defendants Diaz and Hankins from liability on Plaintiff's § 1983 claims against them.

D.     AS THE INDIVIDUAL OFFICERS' CONDUCT DID NOT VIOLATE

21

PLAINTIFF'S CONSTITUTIONAL RIGHTS, PLAINTIFF'S CLAIM OF
MUNICIPAL LIABILITY ALSO FAILS

Having concluded that Plaintiff has not established a violation of the decedent's

constitutional rights, Plaintiff's municipal liability claim also must be dismissed.  *See*

*Ewolski v. City of Brunswick*, 287 F.3d 492, 516 (6th Cir. 2002).  It is well-settled that

where a municipality's liability is alleged on the basis of the unconstitutional actions of

its employees, it is necessary to show that the employees inflicted a constitutional harm.

*City of Los Angeles v. Heller*, 475 U.S. 796, 799, 106 S.Ct. 1571 (1986) (""[N]either

*Monell* [*v. Department of Social Services of City o f New York*, 436 U.S. 658, 98 S.Ct.

2018 (1978)]. . . nor any other of our cases authorizes the award of damages against a

municipal corporation based on the actions of one of its officers when in fact the jury has

concluded that the officer inflicted no constitutional harm.")  Simply stated, *Heller* stands

for the proposition that a "city cannot not be held responsible for a constitutional violation

which could have occurred, but did not."  *Garner v. Memphis Police Dept.*, 8 F.3d 358,

365 (6th Cir. 1993), *cert. denied*, 510 U.S. 177 (1994).  Because no constitutional

violation has been shown, Defendants will also be granted summary judgment on

Plaintiff's Section 1983 claim against the City of Inkster.

E.    MICHIGAN'S GOVERNMENTAL IMMUNITY STATUTE PROTECTS
       DEFENDANTS DIAZ AND HANKINS FROM LIABILITY ON PLAINTIFF'S
       STATE LAW CLAIMS

Plaintiff also has alleged state law claims of gross negligence against Defendants

Diaz and Hankins.  These defendants, however, are protected by governmental immunity.

22

Michigan's governmental immunity statute, M.C.L. § 691.1407, provides in relevant part:

> (2)  Except as otherwise provided in this section, and without regard to the discretionary or ministerial nature of the conduct in question, each officer and employee of a governmental agency, each volunteer acting on behalf of a governmental agency, and each member of a board, council, commission, or statutorily created task force of a governmental agency is immune from tort liability for an injury to a person or damage to property caused by the officer, employee, or member while in the course of employment or service or caused by the volunteer while acting on behalf of a governmental agency if all of the following are met:
>
> (a) The officer, employee, member, or volunteer is acting or reasonably believes he or she is acting within the scope of his or her authority.
>
> (b) The governmental agency is engaged in the exercise or discharge of a governmental function.
>
> (c) The officer's, employee's, member's, or volunteer's conduct does not amount to gross negligence that is the proximate cause of the injury or damage.
>
> * * *
>
> (7)  As used in this section:
>
> (a)  "Gross negligence" means conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results.

M.C.L. § 691.1407(2),(7)(a).

There is no dispute that, at the time of the conduct complained of, Officers Diaz and Hankins were government employees acting within the scope of their authority for a governmental agency which was discharging a governmental function.[4]   Therefore, they

_____

[4]  The operation of a police department is a governmental function.  *See Hill v. Saginaw*, 155 Mich. App. 161 (1986).

23

are immune from liability unless their conduct amounted to gross negligence which was

the proximate cause of Marie Barron's death. M.C.L. § 691.1407(2)(c).  An exception to

governmental immunity is to be narrowly construed.  *Maskery v. Univ. of Mich. Bd. of*

*Regents*, 468 Mich. 609, 614, 664 N.W.2d 165 (2003).

The "gross negligence" exception to qualified immunity requires that the conduct

of the defendant be *the* proximate cause of the plaintiff's injury or damages.  M.C.L. §

691.1407(2)(c).  "'The' proximate cause" means "the one most immediate, efficient, and

direct cause of the injury or damage."  *Robinson v. City of Detroit*, 462 Mich. 439, 462,

613 N.W.2d 307 (2000).  In *Robinson*, the Michigan Supreme Court expressly overruled

*Dedes v. Asch*, 449 Mich. 99, 521 N.W.2d 488 (1994), which had previously held that

"the proximate cause" as used in subsection (2)(c) of § 691.1407 meant "a" proximate

cause:

> As to subsection (c), in *Dedes, supra* at 107, 521 N.W.2d 488, this Court
> effectively interpreted "the proximate cause" in subsection (c) to mean "a
> proximate cause." The Court further explained that "the" proximate cause
> does not mean "sole" proximate cause.  *Id*. We overrule *Dedes* to the extent
> that it interpreted the phrase "the proximate cause" in subdivision (c) to
> mean "a proximate cause." The Legislature's use of the definite article
> "the" clearly evinces an intent to focus on one cause. The phrase "the
> proximate cause" is best understood as meaning the one most immediate,
> efficient, and direct cause preceding an injury.
>
>                     \* \* \*
>
> Further, recognizing that "the" is a definite article, and "cause" is a
> singular noun, it is clear that the phrase "the proximate cause" contemplates
> one cause. Yet, meaning must also be given to the adjective "proximate"
> when juxtaposed between "the" and "cause" as it is here. We are helped by
> the fact that this Court long ago defined "the proximate cause" as "the

24

> immediate efficient, direct cause preceding the injury." *Stoll v.
> Laubengayer*, 174 Mich. 701, 706, 140 N.W. 532 (1913). The Legislature
> has nowhere abrogated this, and thus we conclude that in M.C.L. §
> 691.1407(2)(c); MSA 3.996(107)(2)(c) the Legislature provided tort
> immunity for employees of governmental agencies unless the employee's
> conduct amounts to gross negligence that is the one most immediate,
> efficient, and direct cause of the injury or damage, i.e., the proximate cause.

462 Mich. at 458-62.

Thus, in *Robinson*, the Court held that the police officers were immune from

liability for  injuries sustained by passengers in vehicles fleeing from the police when the

fleeing car caused an accident, because the officers' pursuit of the fleeing vehicles was

not "the proximate cause" of the injuries sustained by the plaintiffs.  "The one most

immediate, efficient, and direct cause of the plaintiffs' injuries was the reckless conduct

of the drivers of the fleeing vehicles."  *Id.* at 462.

As in *Robinson*, in this case the one most immediate, efficient and direct cause of

Marie Barron's death was the reckless driving of Dannie Ray Baker.  The Defendant

officers' conduct in failing to insure that Baker got someone else to drive him home, even

if it amounted to "gross negligence", was not *the* proximate cause of Marie Barron's

death.  Therefore, Defendants Diaz and Hankins are immune from liability.  Accordingly,

summary judgment will be entered in favor of Defendants on Plaintiff's state law

wrongful death claims.

<u>CONCLUSION</u>

For all of the foregoing reasons,

25

IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment

**[Dkt. # 63]** is GRANTED.  Accordingly,

IT IS FURTHER ORDERED that Plaintiff's claims against the City of Inkster,

Lieutenant Thomas Diaz and Officer John Hankins are DISMISSED, in their entirety,

with prejudice.

s/Gerald E. Rosen
Chief Judge, United States District Court

Dated:  February 25, 2011

I hereby certify that a copy of the foregoing document was served upon counsel of record
on February 25, 2011, by electronic mail and upon Dannie Ray Baker, #698162, Kinross
Correctional Facility, 16770 S. Watertower Drive, Kincheloe, Michigan 49788 by
ordinary mail.

s/Ruth A. Gunther
Case Manager